Olan T. BARNETT, Appellant,

v.

The STATE of Texas, Appellee.

No. 42207.

Court of Criminal Appeals of Texas.

July 16, 1969.

Rehearing Denied Oct. 22, 1969.

William D. Tipton, George M. Bishop, Houston, for Olan T. Barnett.

Carol S. Vance, Dist. Atty., Phyllis Bell and Wells Stewart, Asst. Dist. Attys., Houston, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

BELCHER, Judge.

The conviction is for robbery; the punishment, five years.

The indictment jointly charges Olan T. Barnett (appellant), David Daniel Mayberry, and B. F. Tyson, with the robbery of James Sanders, Jr., by the taking of a motor vehicle, to-wit, a truck.

The appellant in his first four grounds of error contends that there is no evidence that he with violence assaulted and placed James Sanders, Jr., in fear of his life and bodily injury and took his truck from him against his will; and that the evidence is insufficient to show that he acted together with Mayberry and Tyson as principals in the commission of the alleged robbery.

The evidence reveals that James Sanders, Jr., was driving a truck for the Houston Cigar Company which contained cigars, cigarettes and candy, and as he

drove away after being stopped for a red traffic light a man, identified at the trial as B. F. Tyson, jumped into his truck, pointed a pistol at him and told him to back up, which he did. When Sanders backed up, his truck hit a tan-colored Buick station wagon which was close behind him on the street. After the truck hit the Buick two or three times, the truck's motor stalled. When Tyson looked back toward the Buick, Sanders jumped out of his truck, ran to the Buick which the appellant, Barnett, was driving and the co-indictee, Mayberry, was seated in the front on the passenger side and Sanders told them he had been robbed. Tyson drove away in Sanders' truck. Sanders also testified that he did not know where Tyson came from unless he had come from the Buick as there were no other cars nearby, and he never saw anyone who may have witnessed the robbery. Sanders further testified that he had passed the Buick shortly before he was held up and "the front seat was full." The appellant told Sanders to get in the Buick and he would help him pursue the truck, but Sanders testified that he refused because, "I figured they were going to rob me too." While riding with a passing motorist who took Sanders in pursuit of his truck, Sanders stopped and notified a policeman who then began pursuit of the truck. After about six blocks, the truck stopped and then the Buick drove away. The officer fired a shot while pursuing the Buick which stopped after travelling a long block. The appellant, Mayberry and Tyson were in the Buick at the time it stopped. Sanders identified the pistol found in the Buick as appearing to be the same one used at the time of the robbery. Sanders also testified that at the time Tyson pointed the pistol at him he was in fear of his life and bodily injury.

Officer Farrar, the arresting officer, testified that he pursued a truck after receiving certain information from James Sanders, Jr. In relating his pursuit of the truck Farrar testified in part as follows:

"A It was a large orange Hav-A-Tampa cigar truck. At this time the truck was parked here. A subject alighted from the truck and entered a stationwagon—a tan Buick stationwagon.

"Q You say a person got out of the truck?

"A Yes, and got into a Brown Buick stationwagon. The stationwagon went back north on Seven Mile Lane and started to turn right on Little York and they were stopped.

"Q At any time, Officer, did you use any of your emergency equipment to stop the car?

"A From the time I started chasing I was using the red light on and I was using the mike at this time to indicate I was giving chase.

"Q At any time during the chase did you exchange any shots or fire any shots at any car?

"A After he entered the Buick and started off on Seven Mile Lane and accellerated their speed I fired a shot and they stopped.

"Q What did you fire the shot with?

"A A 38–40 Winchester rifle.

"Q Officer, at the time you stopped the car who was in the car?

"A Olan T. Barnett was driving the car. Mayberry was in the front seat opposite the driver and B. F. Tyson was laying down across the back seat.

"Q Did you see what door of the car Tyson entered into?

"A He entered the back door on the right hand side.

"Q All right, and was that their immediate position when you drove up?

"A Yes sir.

\* \* \* \* \* \*

"Q So then Tyson got in the stationwagon approximately a block away?

"A Yes sir.

"Q And the stationwagon did not remain stationary after Tyson got in?

"A No sir.

"Q Did they leave at a slow rate of speed or high rate of speed?

"A Very high rate of speed.

"Q You state they attempted to turn right on Little York which would be east. Is that correct?

"A Yes sir.

"Q But never made the turn?

"A The car was pointed—they had already started to make their turn when they stopped.

"Q This was after you fired one warning shot?

"A Yes sir.

"Q And you are sure it was these defendants, Olan Barnett and David Mayberry and one B. F. Tyson in that automobile.

"A Yes sir.

"Q These men seated here?

"A Yes sir.

"Q Did you effect a search of the automobile at that time—the stationwagon?

"A Not immediately when they stopped, no sir. I waited until the other unit got there.

"Q Some other unit did come?

"A Yes sir.

"Q Did you later search the car?

"A Yes sir, I later searched the car.

"Q Did you recover anything from the stationwagon?

"A A .22 caliber pistol.

"Q Where did you get that pistol?

"A Underneath the driver's seat.

"Q I will hand you what's been marked as State's Exhibit No. 1 and ask you if you can identify it, Officer?

"A Yes sir.

\* \* \* \* \* \*

"Q All right, sir, and what was the condition of this pistol at the time you found it?

"A Fully loaded."

On cross-examination by counsel for co-indictee Mayberry, Farrar testified:

"Q Mr. Tyson is the one that had the gun, isn't he?

"A I could not state he had the gun from actually seeing it. Only one time I saw him with the gun and that was when he alighted from the truck.

"Q And you saw this gun at that time?

"A I saw a gun in his hand at that time, yes sir.

"Q Was this the gun he had when he run from the truck?

"A This is the gun I took from underneath the seat.

"Q Did he have a different gun?

"A He had a pistol in his hand at that time.

"Q Is this the gun Tyson had when he run from the truck?

"A Yes sir.

"Q Okay, sir, you didn't find any other gun out there, did you?

"A Sir?

"Q You found no other gun out there?

"A That was the gun I found."

On cross-examination by counsel for the appellant, Farrar testified as follows:

"Q Officer Farrar, did you see Mr. Tyson hide this pistol anywhere in the car?

\* \* \* \* \* \*

"A I seen him lay across the seat and as he laid down it appeared as if he was going to put something under the seat. I could not see the pistol.

"Q Had you seen a pistol before?

"A I had seen a pistol before when he jumped from the truck and got in the car.

\* \* \* \* \* \*

"Q From your observation of Tyson getting out of the truck, would you say he was attempting to commandeer the car with these defendants in it?

"A No sir. They were sitting there with the back door open. The car was sitting there with the back door open waiting for him to jump in.

"Q What time of day or night was this, Officer?

"A It was shortly after noon. Around I would say 12:30 or 12:45, somewhere along in there."

The testimony introduced by the appellant reflects that he stopped his car behind a truck which was stopped at a traffic light; that a man entered the truck, and after it moved forward a short distance it then rolled back into appellant's car, and a man, Sanders, jumped from the truck, came to appellant's car, said he had been robbed and asked the appellant to catch the truck which was driven away at high speed. When the appellant overtook the truck, the driver, Tyson, with a pistol, entered appellant's car and told him to "take off" and appellant drove away, but was soon stopped by an officer. The appellant's defense was that he was trying to assist in apprehending the person who drove the truck away; that he knew nothing about the robbery and did not participate in it as a principal in any manner; and that the officer would not listen to his explanation.

■ The evidence is sufficient to support the conviction of the appellant for the commission of the offense of robbery.

The fifth ground of error is that:

"The trial court committed reversible error by not allowing the defendant's exhibit No. 1 to be admitted into evidence, which if done, would have shown that there was no connection between Tyson and Barnett, thus negating the state's theory of principals."

The appellant sought to introduce into evidence a letter, Defendant's Exhibit No. 1, signed "B. F. Tyson" which states among other things that, "I was arrested with some other fellow that was accuse— of the same offense but believe me no one is involved but me."

The indictment jointly charges "Olan T. Barnett, appellant, David Daniel Mayberry, B. F. Tyson" with the offense of robbery in this case.

Although the court told the appellant he would admit the testimony of his co-indictee Tyson, the appellant would not call Tyson who, according to the evidence, was present and available as a witness, but the appellant insisted that the state should call him which it declined to do.

At this time the following occurred:

"Mr. Bishop (Appellant's Counsel): We would like to move that the letter from the defendant, B. F. Tyson, be admitted into evidence.

"The Court: From whom?

"Mr. Bishop: From B. F. Tyson who has been a defendant in this case.

"The Court: That's who the letter is from?

"Mr. Bishop: The letter is from B. F. Tyson.

"The Court: Can you prove that by that statement?

"Mr. Bishop: I believe the letter will show that. If the State wants to, they can call Mr. Tyson.

"The Court: I am talking about how you would get the letter into evidence. I am not saying the letter is not admissible. Do you want me to say this letter is from the defendant B. F. Tyson who has been convicted in this case?

"Mr. Bishop: No, Your Honor, but I would like to ask the state to produce that into evidence.

"The Court: Are you going to take the stand and say that's who it is from?

"Mr. Bishop: No, Your Honor. We would put one of the people from the District Attorney's office on.

"Mr. Heacock (State's Counsel): At this point it is strictly hearsay. I don't know who it is from.

"The Court: That is what I am saying. I don't know if this is from B. F. Tyson that pleaded guilty this morning or not but the judgment will be admitted as a matter of fact. Let the record so show."

The appellant called the two assistant district attorneys representing the state at the trial, but their testimony only revealed that the letter was in the file when it was delivered to them for the purpose of conducting the trial.

To the offer of the letter into evidence, the court stated:

"Sustained to offering it into evidence. You may have your bill concerning a letter, Counsel. Let the record show there has been a letter that was handed to the Court from the District Attorney out of his file signed by a B. F. Tyson. That's all the Court knows about it. There has been no evidence, so the record will be clear on the Court's ruling, there has been no tying this letter up to the Defendant B. F. Tyson in this case by any admissible evidence this Court is aware of."

In his supplemental brief, the appellant for the first time points out that the jury could have compared the signature on the letter with co-indictee Tyson's signature on the stipulation of evidence which was used when Tyson entered his plea of guilty.

The record shows that the stipulation was read to the jury, but there is no showing that it was ever exhibited to or considered by the jury, or that it was taken to the jury room during their deliberation.

It is evident from the colloquy between the court and appellant's counsel as set out above that the comparison of handwriting by the jury was not relied on during the trial by the appellant to identify the writer of the letter.

■ The court did not err in excluding the introduction of the letter into evidence. Ground of error No. 5 is overruled.

It is observed that the judgment of conviction of the appellant's co-indictee, B. F. Tyson, on his plea of guilty to the offense of robbery with his punishment assessed at ten years which was probated was introduced in evidence by the appellant. Tyson's conviction was for the same robbery for which appellant was tried in this case.

■ In both his original and supplemental briefs the appellant contends that:

"The trial court committed reversible error by not sustaining the defense objections to improper cross examination of defendant Barnett by the prosecuting attorney, when he persisted in inquiring into matters for impeachment purposes that were not final convictions for felo-

nies or misdemeanors involving moral turpitude (Pp. 232–234 of the Record)."

From the appellant's briefs and the state's briefs it appears that this contention arose as follows:

### "RE-DIRECT EXAMINATION"

Questions by Appellant's Counsel:

"Q Mr. Barnett (appellant), have you been in any trouble with the law in the past eight years?

"A No sir, I have not.

"Q This is the first time you have been arrested since 1960?

"A I had traffic tickets."

### "RE-CROSS EXAMINATION"

Questions by State's Counsel:

"Q You stated on direct examination from Counsel you had not been in trouble in the last eight years. Is that right?

"Mr. Miller: I object to that on the grounds that's an improper manner of cross examination.

"The Court: Overruled."

On further cross-examination, the appellant testified that the trouble he had with the law was "only for traffic"; that he was not arrested on February 19, 1964, and turned over to a Postal Inspector; that he was not arrested on April 19, 1964, for aggravated assault; and that he was never arrested for shoplifting. The only objections to the questions asking about the above matters were that they were an improper manner of cross-examination. The objections were overruled.

The foregoing testimony as set out and that summarized is that shown on pages 232–234 of the record which the appellant specifically refers to in his ground of error.

In light of the record, it is concluded that the ground of error should be overruled.

Another ground urged as error is the court's refusal of the request to instruct the jury to disregard the cross-examination of the appellant about matters not shown to be final convictions for felonies or misdemeanors involving moral turpitude.

The testimony is the same as that shown in considering the above ground urged as error. The record reflects that the refusal to charge as requested was not error.

The judgment is affirmed.